**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**
_____

**Appeal No.  22-10709-B**
_____

**UNITED STATES,**

**Appellee**

**v.**

**ROBERTO SANTANA JIMENEZ,**

**Appellant**

_____

**AN APPEAL FROM A CRIMINAL CASE**
**FROM THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**DISTRICT COURT CASE NO.  8:20-cr-00292-VMC-CPT**
_____

**INITIAL BRIEF OF APPELLANT**
_____

Frank W. McDermott
Board Certified Attorney
McDermott Law Firm, P.A.
Florida Bar No. 163120
10010 Seminole Blvd.
Seminole, FL 33772
Phone: 727-367-1080
Fax: 727-367-9940
Frank@injuryarrest.com
CJA Counsel for Appellant Jimenez

No. 22-10709-B

*United States v. Santana-Jimenez*

<u>CERTIFICATE OF INTERESTED PERSONS</u>

In compliance with Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, the undersigned hereby certifies that the following listed persons and entities have an interest in the outcome of this particular case:

1. Bashir, Adeel

2. Covington, The Honorable Virginia M. Hernandez

3. Corrigan, The Honorable Timothy J.

4. Daines, Laura

5. Hall, A. Fitzgerald

6. Handberg, Roger Bernard, III

7. Hoppmann, Karin

8. Landes, Samuel

9. Lopez, Maria Chapa

10. McDonell, Colin P.

11. McNamara, Linda Julin

12. Muench, James A.

13. Porcelli, The Honorable Anthony E.

C1 of 2

14. Pulido, Jordan Jysae

15. Rhodes, David P.

16. Sansone, The Honorable Amanda Arnold

17. Skuthan, James T.

18. Thelwell, Lisa Marie

19. Tuite, The Honorable Christopher P.

No publicly traded company or corporation has an interest in the outcome of this appeal to the undersigned's knowledge.

C2 of 2

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Appellant leaves to this Court's discretion the question of whether oral argument would be necessary and beneficial to the resolution of this appeal.

## **TABLE OF CONTENTS**

**Page**

Certificate of Interested Persons ............................................................ C1

Statement Regarding Oral Argument ...................................................... i

Table of Contents .................................................................................... ii

Table of Citations ................................................................................... v

Statement of Jurisdiction ........................................................................ 1

Statement of the Issues ........................................................................... 2

Statement of Adoption ............................................................................ 3

Statement of the Case ............................................................................. 4

A)    Course of Proceedings and Disposition in the Court Below .......... 4

B)    Statement of Facts ......................................................................... 9

C)    Standards of Review ....................................................................... 23

Summary of the Argument ...................................................................... 25

Argument and Citations of Authority ..................................................... 26

I.    THE DISTRICT COURT ERRED IN DENYING THE MOTION
      FOR A JUDGMENT OF ACQUITTAL BECAUSE THE
      EVIDENCE WAS INSUFFICIENT TO PROVE THAT MR.
      JIMENEZ AGREED TO TRANSPORT I.G. FOR PURPOSES OF
      ENGAGING IN CRIMINAL SEXUAL ACTIVITY ................................... 26

      A. The Elements and Proof Required for the Charge Alleged ....................... 27

## <u>TABLE OF CONTENTS, Continued</u>

<u>Page</u>

B. The Evidence Failed to Prove the Existence of an Agreement Between Mr. Jimenez and Mr. Pulido that I.G. Would be Transported to Engage in Sexual Activity. ........................................................29

II.    THE DISTRICT COURT ERRED IN DENYING THE MOTIONS FOR MISTRIAL AND FOR A NEW TRIAL BASED ON THE CASE AGENT'S TESTIMONY CONCERNING MR. JIMENEZ'S IMMIGRATION STATUS ..........................................................32

III.   THE DISTRICT COURT ERRED IN IMPOSING THE U.S.S.G. § 2G1.3(b)(1)(B) OFFENSE LEVEL ENHANCEMENT FOR THE DEFENDANT HAVING CUSTODY, CARE OR SUPERVISORY CONTROL OVER THE MINOR ..............................................37

IV.    THE DISTRICT COURT FURTHER ERRED IN IMPOSING THE "UNDUE INFLUENCE" OFFENSE LEVEL ENHANCEMENT..............40

Conclusion ...........................................................................45

Certificate of Compliance with Rule 32(a)...........................................46

Certificates of Service ...............................................................47

iii

# **TABLE OF CITATIONS**

**Cases**                                                                                           **Page**

*Goti v. United States*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) ..........32

*Iannelli v. United States*,
   420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975)......................................27

*Ingram v. United States*, 360 U.S. 672 (1959)......................................................28

*United States v. Adkinson*, 158 F.3d 1147 (11th Cir. 1998) .................................27

*United States v. Anderson*, 782 F.2d 908 (11th Cir. 1986)...................................33

*United States v. Blake*, 868 F.3d 960 (11th Cir. 2017)..........................................41

*United States v. Brooks*, 610 F.3d 1186 (9th Cir. 2010).................................. 38-39

*United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004)...................................27

*United States v. Demarest*, 570 F.3d 1232 (11th Cir. 2009) ................................23

*United States v. Emmanuel*, 565 F.3d 1324 (11th Cir. 2009)...............................32

*United States v. Funt*, 896 F.2d 1288 (11th Cir. 1990) ........................................33

*United States v. Harriston*, 329 F.3d 779 (11th Cir. 2003) ..................................33

*United States v. Hoschouer*, 224 Fed. Appx. 923 (11th Cir. 2007)......................28

*United States v. Lopez*, 652 Fed. App'x 891 (11th Cir. 2014) .............................32

*United States v. Martinez*, 763 F.2d 1297 (11th Cir. 1985)..................................32

*United States v. McCrimmon*, 362 F.3d 725 (11th Cir. 2004)..............................23

*United States v. Mobley*, 711 Fed.Appx. 547 (11th Cir. 2017) ............................23

*United States v. Parker*, 839 F.2d 1473 (11th Cir. 1988)................................27, 31

iv

**<u>TABLE OF CITATIONS, Continued</u>**

<u>Cases (Cont.)</u>                                                                          <u>Page</u>

*United States v. Ross*, 131 F.3d 970 (11th Cir. 1997) ............................................28

*United States v. Silvestri*, 409 F.3d 1311 (11th Cir. 2005)....................................27

*United States v. Simon*, 839 F.2d 1461 (11th Cir. 1988)........................................27

*United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998) ........................................27

*United States v. Vallejo*, 297 F.3d 1154 (11th Cir. 2002) .....................................23

*United States v. Vera*, 701 F.2d 1349 (11th Cir. 1983) .........................................27

*United States v. Vicaria*, 12 F.3d 195 (11th Cir. 1994) .........................................32

*United States v. Whyte*, 928 F.3d 1317 (11th Cir. 2019) ...................... 9, 24, 41-42

**<u>Statutes and Rules</u>**

11th CIR. PATTERN JURY INSTRUCTIONS – CRIM. § 93.1 (2022)...........................28

11th Cir. R. 26.1-1 .....................................................................................................C1

11th Cir. R. 28-1 ........................................................................................................46

18 U.S.C. § 3231 ..........................................................................................................1

18 U.S.C. § 2423 ..........................................................................................................4

28 U.S.C. § 1291 ..........................................................................................................1

FED. R. APP. P. 26.1.....................................................................................................C1

FED. R. APP. P. 28........................................................................................................3

FED. R. APP. P. 32........................................................................................................46

## TABLE OF CITATIONS, Continued

**Statutes and Rules (Cont.)**                                    **Page**

FED. R. APP. P. 33 ................................................................................32, 36

U.S.S.G. § 2G1.3 ........................................................... 2, 5, 24, 37-41, 43

## **STATEMENT OF JURISDICTION**

Under 28 U.S.C. § 1291, the courts of appeal have jurisdiction from all final decisions of the district courts of the United States, except where a direct review may be had in the Supreme Court of the United States. The United States District Court for the Middle District of Florida, Tampa Division, exercised jurisdiction pursuant to 18 U.S.C. § 3231.

The district court entered its final judgment on March 3, 2022. (Doc. 256). Mr. Jimenez, thereafter, filed a timely notice of appeal on March 4, 2022. (Doc. 259). On March 14, 2022, the district court entered an amended judgment. (Doc. 264.)

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in denying the Appellant's motion for a judgment of acquittal on a charge of conspiracy to transport a minor with intent to engage in unlawful sexual activity when the Government presented no evidence that the Appellant entered into an agreement that the minor would engage in any such unlawful sexual activity in the United States?

II.    Whether the district court erred in denying motions for mistrial and for a new trial when the case agent testified, in contravention of a motion in limine, concerning the Appellant's immigration status in the United States?

III.    Whether the district court erred in applying a two-level offense level enhancement under the U.S.S.G. § 2G1.3(b)(1)(B) for the minor victim having been in the custody, care, or supervisory control of the defendant when the relationship between the Appellant and the minor arose entirely from the alleged offense itself?

IV.    Whether the district court erred in applying a two-level offense level enhancement under the U.S.S.G. § 2G1.3(b)(2)(B) for a participant purportedly unduly influencing a minor to engage in prohibited sexual conduct?

## STATEMENT OF ADOPTION

Pursuant to Federal Rule of Appellate Procedure 28(i), Appellant Roberto Santana Jimenez adopts by reference any non-adverse issues and arguments raised in the initial brief of the co-appellant Jordan Pulido.

## STATEMENT OF THE CASE

A.    Course of Proceedings and Disposition in the Court Below

Appellant Roberto Santana Jimenez was charged, alongside his son Jordan Pulido, in the lower court, the Middle District of Florida, Tampa Division, with one count of conspiracy to transport a minor with intent to engage in criminal sexual activity pursuant to 18 U.S.C. § 2423(a) and (e). (Doc. 1.)  The indictment alleged that Mr. Jimenez and his son Jordan Pulido conspired to transport the alleged victim, a 15-year-old with whom Mr. Pulido had begun a relationship, from Croatia to Florida to engage in sexual activity that could constitute a crime. (Doc. 1.)

Both Defendants proceeded to a jury trial beginning on October 18, 2021. (Doc. 212.)  Prior to trial, Mr. Jimenez moved in limine to preclude any evidence concerning his immigration status in the United States. (Doc. 124.)  The Government asserted in its response that it did not intend to present any such evidence. (Doc. 137.)

At trial, following the Government's case-in-chief, Mr. Jimenez moved for a judgment of acquittal. (Doc. 181.)  Mr. Jimenez additionally moved for a mistrial based on the Government's case agent having testified, in contravention of the motion in limine, that Mr. Jimenez had lawfully immigrated to the United States and remained there illegally. (Doc. 183.)   The district court denied the motion for

judgment of acquittal but took the motion for mistral under advisement.  (Doc. 218 at 167-78.)

The jury went on to find Mr. Jimenez guilty as charged on October 28, 2021. (Doc. 196.)

Mr. Jimenez thereafter filed a motion for new trial on November 10, 2021. (Doc. 203.)  In addition to the violation of the motion in limine arising from the evidence of Mr. Jimenez's immigration status, the motion additionally sought a new trial on grounds of improper interpretation procedures employed by a Croatian interpreter and on the Government's presentation of evidence of I.G.'s chastity. (Doc. 203.)  On December 6, 2021, Mr. Jimenez additionally filed a memorandum of law in support of his motion for mistral. (Doc. 222.)  On Febraury 23, 2022, the district court entered an order denying the motions for mistral and for new trial. (Doc. 247.)

The district court conducted the sentencing hearing on Febraury 24, 2022. (Doc. 250.)  The Presentence Report proposed a Guidelines range falling at total offense level 43 and criminal history category I. (PSR ¶ 120.)  The proposed offense level included a two-level offense level enhancement under U.S.S.G. § 2G1.3(b)(1)(B) for the minor victim having been in the custody, care, or supervisory control of the defendant, as well as a two-level offense level enhancement under U.S.S.G. § 2G1.3(b)(2)(B) for a participant unduly influencing the minor to engage

in prohibited sexual conduct. (PSR ¶ 61-62.)  Mr. Jimenez objected to both of those

proposed enhancements. (Doc. 250 at 9, 18-20.)

The district court overruled the objection to the "custody, care, or supervisory

control" enhancement, finding as follows:

> Defense counsel notes, in the memo that was provided, that there was
> no preexisting relationship between I.G. and Mr. Santana Jimenez and
> no relationship outside of the conduct concerning the offense. Defense
> counsel points out that the crime of conviction, transporting a minor,
> was committed and finished well before I.G.'s family left for Croatia
> and Mr. Santana Jimenez allegedly fell into the custodian or caretaker
> role.
>
> Probation responds that Santana Jimenez can be held responsible for all
> acts that were within the scope of the conspiracy, including acts that
> furthered the criminal activity, thus he could be held accountable for
> events occurring after I.G. arrived in the United States.
>
> Here, he arranged for I.G. and her family's travel. I.G.'s mother
> entrusted him to return her daughter on the next flight to Croatia, and
> I.G. stayed at Santana Jimenez's home from August 6th, when her
> family left, until August 12th, when she -- when law enforcement came
> to get her.
>
> So I'm overruling this objection. It seems clear to me that once I.G.'s
> mother had left, she entrusted I.G. to Santana Jimenez and she stayed -
> - I.G. stayed at his house and under his supervision for the next week.
> Getting I.G. to stay in Florida seems like a furtherance of the
> conspiracy, getting I.G. to have sex with Pulido. Well, I couldn't find
> very many -- I couldn't find much guidance from the Eleventh Circuit
> on this guideline, but what does exist supports application of the
> enhancement.
>
> For example, the Eleventh Circuit has upheld the application of the
> enhancement against two defendants who were aiders and abetters in
> the sex trafficking of a minor, where they were helping to transport the
> minor and the minor had entrusted herself to the care of the co-

defendant. That's *United States versus Jennings*, 280 Federal Appendix 836, 845, Eleventh Circuit, 2008.

The evidence is sufficient to demonstrate the defendants directly oversaw J.B., slept in the motel room with her, and, as aiders and abetters of the prostitution venture, were partially responsible for J.B.'s custody and supervisory control.

So I overrule the objection for that reason…

(Doc. 250 at 16-17.)

The court likewise overruled the objection to the undue influence enhancement:

In a case in which a participant is at least ten years older than the minor, there should be a rebuttable presumption that Subsection (b)(2)(B) applies. In such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor.

Defense counsel has argued that the conversations between Pulido and Jimenez could not have served in any way to influence I.G., and that Jimenez did not abuse superior knowledge or resources, because she was predisposed to have sex with Pulido, writing that I.G. was already planning on having sex prior to any direct contact with Mr. Jimenez and nothing he said or did directly influenced her to do anything more than she was already planning on doing.

Here's what probation said: "I.G. had expressed to Jordan Pulido that she had never kissed or held hands with a boy, much less had sexual contact. I.G. had informed Jordan Pulido she wanted to wait until she was at least 17 to have sex. The defendant encouraged the couple's relationship and told I.G. he hoped that she would never cheat on his son or break up with him. They discussed her being faithful and that Jordan Pulido would not be as jealous once he visited Croatia.

"The defendant developed a relationship with I.G., and he made her feel accepted into their family. The defendant had discussions with I.G.

7

regarding her intentions of going to school in the United States and advised her that his question was a test of her commitment. The defendant discussed ways for Jordan Pulido and I.G. to avoid pregnancy.

"The defendant used his resources to arrange and pay for I.G. and her family to come to Florida. The defendant and Jordan Pulido conspired to have I.G. remain in Florida without her family and become Pulido's wife. After her family departed, I.G. remained living in the defendant's home, ate her meals there, and relied on the defendant for basic necessities.

"The defendant and his family worked to isolate I.G. from easily communicating her apprehensions and circumstances to her family. They did this by keeping control over her social media, having her translate messages to and from her family, and by monitoring as much of her interactions as possible.

"The defendant, who was age 59 at the time, unduly influenced I.G. to engage in prohibited sexual conduct while she was in Croatia and in the United States. The defendant arranged for I.G. to come back with Jordan Pulido and orchestrated a scheme to keep her in the United States so that she would continue to be with Jordan Pulido. I.G. was young, vulnerable, and inexperienced. She was charmed by the defendant and his family. Money was spent on her and her family. The defendant's influence over I.G. compromised her voluntariness and her behavior."

It is very fact-dependent. I did not believe that Mr. Pulido should get the enhancement, but I most certainly believe that Mr. Santana Jimenez should. Let's start with their age gap. So there's a rebuttable presumption that he had undue influence over I.G., and I don't believe that presumption has been rebutted in any way, shape, or form.

There was also evidence that he pretended to be a doctor, talked to I.G. about her fertility and her fidelity to Pulido. He spent money on I.G.'s family trip to Florida. They were staying at his house.

For these and all the reasons that we've talked about, what probation has stated, the different paragraphs that I've referred to during this

hearing, it is absolutely reasonable to say that Jimenez abused his superior knowledge, influence, and resources to compromise the voluntariness of I.G.'s behavior. What happened here is certainly within the parameters of the *Whyte* case that I cited to previously that's at 928 F.3d 1336. So I think I talked about that yesterday at length, but it is *Whyte*, the *Whyte* case, 928 F.3d 1336. So this objection is overruled.

(Doc. 250 at 28-30.)

After ruling on other objections, the district court calculated the Guidelines range at total offense level 41 and criminal history category I. (Doc. 250 at 36-37.) At that range the Guidelines suggested a sentence of 324 to 405 months imprisonment. (Doc. 250 at 36-37.) The district court went on to impose a sentence of 20 years imprisonment to be followed by lifetime supervised release. (Doc. 250 at 61.)

Mr. Jimenez filed a notice of appeal on March 4, 2022. (Doc. 259)

He remains incarcerated on the judgment and sentence.

B.    **Statement of the Facts**

The alleged victim in the instant case, I.G, was from Croatia. (Doc. 214 at 12.) Co-defendant Jordan Pulido was Mr. Jimenez's son.  Mr. Jimenez and Mr. Pulido lived in Florida. (Doc. 214 at 23.)  I.G. met Mr. Pulido over the internet on an application named YouNow. (Doc. 214 at 13.)  The application allows users to broadcast and livestream themselves on the internet. (Doc. 214 at 13.)  I.G. noticed Mr. Pulido on the application when he was playing guitar and singing. (Doc. 214 at

9

13.)  I.G. was interested in music herself, so she began following Mr. Pulido on the application in or around September 2017. (Doc. 214 at 13.)

At that time, I.G. was 14 years-old. (Doc. 214 at 14.)  I.G. had told Mr. Pulido, however, that she was 15 years-old. (Doc. 214 at 17.)  Mr. Pulido was 23 years-old at that time. (Doc. 214 at 21.)  I.G. began taking guitar lessons from Mr. Pulido over the internet. (Doc. 214 at 15-16.)  The two also communicated over the Skype application. (Doc. 214 at 16.)

I.G. testified that she and Mr. Pulido went on to become friends. (Doc. 214 at 18.)  She further testified that, in her mind, on March 25, 2018, she and Mr. Pulido officially became boyfriend and girlfriend. (Doc. 214 at 20.)  I.G. alleged that she told Mr. Pulido, however, that she wanted to wait until she was 17 or 18 years-old before she had sexual relations with anyone. (Doc. 214 at 46.)  She testified that Mr. Pulido told her that he would respect that wish. (Doc. 214 at 47.)

Mr. Pulido and I.G. would allegedly masturbate in front of one another over the internet. (Doc. 214 at 48-50.)  I.G. alleged that, at some point, Mr. Pulido told her that the age of consent in Croatia was 15 years old. (Doc. 214 at 50-51.)  I.G. also, however, claimed at trial that she had told Mr. Pulido sometime prior to that time that she had lied about her age and that she was really 14 years-old. (Doc. 214 at 21-22.)  Mr. Pulido purportedly responded that, rather than waiting three years, he would have to wait for four years for her to turn 18 years-old. (Doc. 214 at 22.)

10

The two later began having serious talks about getting married to one another. (Doc. 214 at 26-27.)

During video messaging, I.G.'s mother advised Mr. Pulido that he should visit them in Croatia if he has the opportunity. (Doc. 216 at 185.) The mother also told Mr. Pulido that he could stay at their home if he ever visited Croatia. (Doc. 216 at 185.) On June 15, 2018, Mr. Pulido travelled to Croatia to meet I.G. and her family. (Doc. 214 at 29.) Prior to Mr. Pulido's trip, I.G.'s mother spoke with Mr. Pulido's father, Roberto Jimenez, over Skype regarding the logistical aspects of the trip. (Doc. 214 at 34; 216 at 186.)

Prior to the time Mr. Pulido travelled to Croatia, I.G. had told Mr. Pulido that she wanted to be rescued from Croatia. (Doc. 214 at 142.) She testified at trial, however, that she had never meant that and would say it when she was arguing with her mother. (Doc. 214 at 142.)

In any event, during his trip to Croatia, Mr. Pulido stayed with I.G.'s family. (Doc. 214 at 29.) I.G. turned 15 years-old during that trip. (Doc. 214 at 51.) On I.G.'s birthday, Mr. Pulido presented I.G. with a ring and proposed marriage to her. (Doc. 214 at 57.) I.G. accepted the proposal. (Doc. 214 at 57.)

Mr. Pulido stayed with I.G. and her family in Croatia for approximately six weeks. (Doc. 214 at 72.) I.G. alleged that she and Mr. Pulido had sexual intercourse

during the trip. (Doc. 214 at 63.)   She could not remember, however, if it occurred on the day of the proposal or not. (Doc. 214 at 63.)

I.G. testified that she knew other members of Mr. Pulido's family to use his social media accounts at times. (Doc. 214 at 38-39.)  I.G. alleged that she believed Mr. Jimenez would be using the account whenever she saw repeated typographical errors. (Doc. 214 at 39.)  She also testified that the person she believed to be Mr. Jimenez sometimes referred to himself as "Dad" in social media communications. (Doc. 214 at 39.)  Mr. Jimenez made a standing objection to lack of foundation and authentication as to I.G.'s testimony concerning communications that she believed to have been from Mr. Jimenez on Mr. Pulido's social media accounts. (Doc. 214 at 41.)  Those alleged communications included communications in which I.G. would be scolded for things such as standing too close to other boys in photographs. (Doc. 214 at 39-42.)  I.G. also alleged that she talked with Mr. Jimenez over Facebook messenger about her enrolling in school in the United States. (Doc. 214 at 77-78.)  She claimed that the person she believed to be Mr. Jimenez told her that he was a surgeon and that he could her help her become a nurse. (Doc. 214 at 78.)  She further claimed that Mr. Pulido and Mr. Jimenez discussed I.G. living with them in the United States. (Doc. 214 at 80.)  I.G. claimed that she and Mr. Pulido talked with Mr. Jimenez about her menstrual cycles and when the two of them should not have sexual intercourse. (Doc. 214 at 89.)  In still other online messaging, Mr. Jimenez

12

purportedly referred to I.G. as his daughter. (Doc. 215 at 11-13, 70, 75-82.) In those online messages, the person purported to be Mr. Jimenez has numerous conversations with I.G. regarding how to be carry out a relationship. (Doc. 215 at 75-82.) On cross-examination, I.G. confirmed that she did not always know who she was actually talking to during the remote communications. (Doc. 216 at 13-15.)

I.G. testified that, during Mr. Pulido's Croatia trip, Mr. Pulido and Mr. Jimenez proposed that I.G. and her family travel to Florida to meet Mr. Pulido's family. (Doc. 214 at 73-76.) Mr. Jimenez discussed the logistics of that trip with I.G.'s mother over the internet. (Doc. 214 at 76; 217 at 4-9.) I.G.'s mother took I.G. to the U.S. embassy to obtain a visa prior to the trip. (Doc. 216 at 26.) In late July, I.G. travelled with her mother, sister, brother, and Mr. Pulido to Florida. (Doc. 214 at 85.) She testified that someone in Mr. Pulido's family paid for the airline tickets. (Doc. 214 at 85.) I.G. and the family all had roundtrip tickets. (Doc. 216 at 33.)

On that trip, I.G. and her family stayed with Mr. Pulido's family in their home. (Doc. 214 at 87.) The trip was planned to last for two weeks. (Doc. 214 at 88.) The families went on various usual excursions during that trip. (Doc. 214 at 87-88.) I.G. claimed that she and Mr. Pulido engaged in sexual activity during that trip. (Doc. 214 at 88.)

I.G.'s mother testified that she and Mr. Jimenez had discussed the possibility of I.G. and Mr. Pulido marrying sometime in the future. (Doc. 217 at 15-16.) The

13

mother testified that she had told Mr. Jimenez that it would be nice if I.G. and Mr. Pulido married and that she would like her children to have spouses who were like Mr. Pulido. (Doc. 217 at 15-16.)  She testified at trial, however, that that was a "theoretical conversation." (Doc. 217 at 16.)

Towards the end of the trip, Mr. Jimenez allegedly told I.G.'s brother that he had discussed with I.G.'s mother I.G. staying with his family in the United States and enrolling in school there. (Doc. 214 at 96.)  I.G. alleged that Mr. Pulido and Mr. Jimenez had asked her to tell her mom that she wanted to stay in the United States. (Doc. 214 at 97.)  I.G. told her mother as such. (Doc. 214 at 98.)  I.G. testified that she did not believe her mother took her desires seriously. (Doc. 214 at 98.)  I.G.'s mother recalled that I.G. told her that she was in love with Mr. Pulido and that she wanted to stay in the United States. (Doc. 217 at 17.)  The mother testified that she told I.G. that she could not stay. (Doc. 217 at 18.)  I.G. purportedly responded "Okay." (Doc. 217 at 18.)

I.G. alleged at trial that she believed that her identification and passport were hidden somewhere in Mr. Pulido's home. (Doc. 214 at 102.)  She testified that she "thought" Mr. Jimenez had told her that those items had been hidden after the fact. (Doc. 214 at 103.)  She also testified on cross-examination, however, that she did not intend to return to Croatia on the date she was scheduled to leave with her family. (Doc. 216 at 31-32.)

14

I.G.'s brother testified that the night prior to the family's scheduled return, Mr. Pulido and Mr. Jimenez advised him that I.G. wanted to stay in the United States and that they would take care of her and enroll her in school. (Doc. 216 at 105.)  I.G. was present for that discussion. (Doc. 216 at 105.)  The brother advised that he did not agree with I.G. staying. (Doc. 216 at 105-06.)  The brother testified that I.G. appeared to disapprove of his position. (Doc. 216 at 105-06.)

I.G.'s sister similarly testified that Mr. Jimenez had advised her that night that I.G. had decided she wanted to stay in the United States. (Doc. 216 at 145-46.)  The sister testified that she was a "bit confused" but "didn't care much" because she thought her sister was "mature enough to make her own decisions." (Doc. 216 at 145-46.)  That night, when I.G. and her sister were alone, I.G. told the sister that she wanted to stay in the United States. (Doc. 216 at 154.)

The morning that the family was to return to Croatia, I.G. and Mr. Pulido went to a Bob Evans restaurant. (Doc. 214 at 104.)  I.G. testified that she knew that she was not getting on the return flight with her family. (Doc. 214 at 104.)  She testified that she "thought" she wanted to return to Croatia with them. (Doc. 214 at 104.)  She also testified that she did not think she ever told Mr. Pulido that she wanted to return to Croatia. (Doc. 214 at 105.)  I.G. claimed that Mr. Pulido had told her that they would need to break up if she returned to Croatia. (Doc. 214 at 105-06.)  She also

claimed that, while at the restaurant, she saw text messages between Mr. Pulido and Mr. Jimenez discussing I.G.'s family getting on the return flight. (Doc. 214 at 107.)

Meanwhile that morning, while I.G. and Mr. Pulido were at the restaurant, I.G.'s family expressed concern over I.G. not being present. (Doc. 216 at 108-09.) Mr. Jimenez told the family that he was trying to locate I.G. and Mr. Pulido. (Doc. 216 at 108-10.) I.G.'s family eventually decided to return to Croatia without I.G. (Doc. 216 at 111.) I.G.'s brother alleged that Mr. Jimenez told them that he would find I.G. and have her on the next flight to Croatia. (Doc. 216 at 111.)

Sometime that morning, I.G.'s mother received a Facebook message stating to the effect of "Mom, forgive me. I love you very much. I know that you would never let me to stay, that you would never accept that. So I had to do it this way." (Doc. 217 at 21.) The mother testified that she had told Mr. Jimenez that she was considering calling the police. (Doc. 217 at 23.) She alleged that Mr. Jimenez responded that it would not be a good idea for her to do so because he had spoken to Mr. Pulido and I.G. and that I.G. informed him that she wants to stay. (Doc. 217 at 23.) He also purportedly advised that if she persisted in having I.G. return to Croatia, I.G. would seek asylum in the United States and that she would not thereby be able to see I.G. for an extended period. (Doc. 217 at 23.) He also told her that once I.G. returned to his house, he would talk to her and convince her to return to Croatia on the next available flight. (Doc. 217 at 23.)

16

I.G. and Mr. Pulido later met up with Mr. Jimenez. (Doc. 214 at 127.)  I.G. alleged that Mr. Jimenez had told her parents that he would go out looking for I.G. because she was missing. (Doc. 214 at 127.)  I.G. testified that the next day, she told Mr. Pulido and Mr. Jimenez that she wanted to return home. (Doc. 214 at 129.)  She alleged that Mr. Jimenez got mad and yelled at her. (Doc. 214 at 129-30.)  She claimed that Mr. Pulido cried and told I.G. that she didn't love him. (Doc. 214 at 129.)  Mr. Jimenez reportedly told I.G. that he would try to get her a plane ticket back home. (Doc. 214 at 131.)  After several days, Mr. Jimenez had reportedly told I.G. he was trying to find a ticket but had not been able to do so. (Doc. 214 at 131-33.)

On cross-examination, I.G. admitted that she wanted to stay in the United States at the time that her family returned to Croatia. (Doc. 215 at 128-29.)  She had also expressed that desire to Mr. Pulido. (Doc. 215 at 128-29.)  She testified, however, that what she meant by that was that she only wanted to stay for a week or two longer. (Doc. 215 at 129.)  She further testified that she had had discussions with her siblings about staying in the United States. (Doc. 215 at 129-30.)  She, likewise, confirmed that she told her mother that she wanted to stay in the United States. (Doc. 215 at 130.)

While she remained in the United States after her family left, I.G. had contact with her mother. (Doc. 214 at 134.)  She alleged that, at first, she had uncontrolled

17

access to communicate with her mother. (Doc. 214 at 134.) She claimed that she later attempted to change passwords on some media accounts and that her access to her mother was controlled from that point onward. (Doc. 214 at 134.) At some point, I.G. gave her mother the address of the Pulido-Jimenez home. (Doc. 214 at 135.) She alleged that Mr. Pulido and Mr. Jimenez found out that she had done so and became angry with her. (Doc. 214 at 135-36.)

I.G. also met with an immigration attorney and completed paperwork to seek asylum. (Doc. 214 at 136.) She claimed that it had been Mr. Jimenez's idea for her to do so. (Doc. 214 at 136-39.)

I.G. and her mother had a code that I.G. was to send if "things got bad." (Doc. 214 at 143.) At some point, I.G. sent the mother that code. (Doc. 214 at 144.) Sometime later, law enforcement showed up at the Pulido-Jimenez home. (Doc. 214 at 144.) Mr. Jimenez invited law enforcement inside the home. (Doc. 217 at 71.) Mr. Jimenez advised law enforcement that Mr. Pulido had visited I.G. in Croatia and was harassed while there. (Doc. 217 at 71.) He then returned to Florida with I.G. and members of I.G.'s family, all of whom stayed at the Jimenez-Pulido house while on their trip. (Doc. 217 at 71-72.) During the trip, I.G. decided that she wanted to stay in the United States. (Doc. 217 at 72.) I.G. then applied for political asylum. (Doc. 217 at 72.) Mr. Jimenez provided law enforcement with immigration forms related to I.G.'s request. (Doc., 217 at 73-74.)

I.G.'s mother testified that Mr. Jimenez contacted her that same morning and informed her that "they came regarding I.G." and that she should tell them that she was aware of everything and that I.G. had a ticket for a return flight home. (Doc. 217 at 47.)  Mr. Jimenez thereafter provided his phone to law enforcement. (Doc. 217 at 115.)

I.G. went on to speak with the officers. (Doc. 214 at 144-46; 217 at 76.)  I.G. then went into temporary custody of the Department of Children and Families. (Doc. 214 at 147; 217 at 86-87.)  Officers retrieved I.G.'s property from within the Jimenez-Pulido home but were unable to locate I.G.'s cellular phone. (Doc. 214 at 147.)  Mr. Jimenez advised law enforcement that he was not able to locate I.G.'s phone. (Doc. 217 at 84.)

When being questioned by law enforcement, I.G. denied ever having had sexual relations with Mr. Pulido. (Doc. 214 at 148; 215 at 140.)  She likewise told Child Protective Services officers that she never has sex with Mr. Pulido. (Doc. 215 at 140.)  She also told officers that she hoped she was still engaged. (Doc. 215 at 134.)  While in a children's home in days that followed, I.G. met a woman from Montenegro. (Doc. 215 at 141.)  The woman later took I.G. to a hospital for a medical screening. (Doc. 215 at 141.)  I.G. also told that woman that she never had sex with Mr. Pulido. (Doc. 215 at 141-42.)

Two days later, I.G. met with her mother and returned to Croatia. (Doc. 214 at 154; 217 at 87.)  Sometime after I.G. had returned to Croatia, she told authorities that she had had sex with Mr. Pulido. (Doc. 214 at 150.)  She testified that she changed her story at that point because she was losing feelings for Mr. Pulido. (Doc. 214 at 150.)

Law enforcement believed that, the day after police went to the Jimenez-Pulido house, Mr. Pulido purportedly went to Mexico. (Doc. 218 at 111-12.)  The Government admitted evidence at trial that a person purported to be Mr. Jimenez sent Mr. Pulido internet messages on August 28, 2018 stating "The coast is clear" and "So get yo ass back ASAP." (Doc. 218 at 111.)

On or around September 5, 2018, I.G. and Pulido had online conversations about I.G. potentially being pregnant. (Doc. 217 at 93-97.)  Those conversations took place at the behest of law enforcement. (Doc. 217 at 93-97.)  At some later point that day, I.G. messaged Mr. Pulido to "leave me alone already." (Doc. 215 at 103, 135.)  Mr. Pulido responded by asking for her to leave him alone and made statements such as "you are the worst thing that's ever happened in anybody's life" and "the very thought of you makes me sick." (Doc. 215 at 103-04.)  I.G testified that she was annoyed by those messages. (Doc. 215 at 104.)  Those messages were the last communications I.G. and Mr. Pulido had. (Doc. 215 at 135.)

A special agent working on the case testified regarding various records of communications she had reviewed in the course of her work on the case. (Doc. 218 at 6-21, 107-155.)  She testified that members of the Jimenez-Pulido family often shared and used one another's messaging and social media accounts. (Doc. 218 at 33.)  She additionally testified that she observed communications between people she believed to be Mr. Jimenez and Mr. Pulido discussing sex and, purportedly, Mr. Pulido having sex with I.G. (Doc. 218 at 33, 125-27, 157-58.)  In other messages, Mr. Pulido and a person purported to be Mr. Jimenez are discussing Mr. Pulido potentially marrying I.G. when she turns 16 years-old. (Doc. 218 at 128-29.)

At the end of the Government's case in chief, the case agent testified concerning investigations she conducted into Mr. Jimenez.  She testified that she had conducted an "I-9 inspection" and a "wage and hour report" at Mr. Jimenez's employer, the Laser Spine Institute. (Doc. 218 at 138).  Mr. Jimenez then requested a sidebar and indicated that he was concerned that the Government was about to elicit testimony concerning Mr. Jimenez's immigration status. (Doc. 218 at 138-39.) The Government responded by stating that it only intended to present evidence that Mr. Jimenez was not a medical doctor. (Doc. 218 at 139.)  The agent then testified as follows:

> Q. Agent Garcia, as a result of your investigation, were you able to determine whether or not Mr. Jimenez was a doctor?
> A. I was. I was, yes.
> Q. What was the result of your investigation?

21

A. Based on our investigation, we determined that Mr. Jimenez entered the United States legally in the '80s, but he remained in the United States –

(Doc. 218 at 140.)  At that point, Mr. Jimenez objected. (Doc. 218 at 140.)  The court

sustained the objection and instructed the jury to disregard that answer. (Doc. 218 at

141.)

Mr. Jimenez thereafter moved for a mistrial based on the testimony

concerning his immigration status. (Doc. 218 at 167.)  The court took the motion

under advisement and expressed great concern over the agent's testimony. (Doc. 218

at 167-69.)

Mr. Jimenez additionally moved for a judgment of acquittal at the close of the

Government's case, asserting that the Government had not presented any evidence

of any agreement that I.G. would travel for purposes of engaging in any sexual

activity in the United States before she reached the lawful age of consent. (Doc. 218

at 171.)  The court denied that motion (Doc. 218 at 178.)

The jury would go on to find Mr. Jimenez guilty as charged.  He was later

sentenced as set forth above.

This appeal follows.

C.    **Standards of Review**

As to Issue I, this Court reviews the sufficiency of the evidence *de novo*. *United States v. McCrimmon*, 362 F.3d 725, 728 (11th Cir. 2004). In conducting that review, the Court "views the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." *Id.*

As to Issue II, this Court reviews for abuse of discretion the district court's denial of a motion for new trial. *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002).

As to Issue III, this Court "reviews the district court's application of the Sentencing Guidelines *de novo* and its factual findings for clear error." *United States v. Mobley*, 711 Fed.Appx. 547, 550 (11th Cir. 2017) *citing United States v. Demarest*, 570 F.3d 1232, 1239 (11th Cir. 2009). In the instant case, the facts underlying the application of the "care, custody, or supervisory control" enhancement are not expected to be in dispute. The question concerning the application of that enhancement will be a pure question of law. This Court should therefore review the issue *de novo*.

Finally, as to Issue IV, this Court reviews a district court's assessment of the

U.S.S.G. § 2G1.3(b)(2)(B) offense level enhancement for clear error. *United States*

*v. Whyte*, 928 F.3d 1317, 1336 (11th Cir. 2019).

## SUMMARY OF THE ARGUMENT

The Government failed to carry its burden of presenting sufficient evidence to support a finding that Mr. Jimenez entered into an agreement with Mr. Pulido to transport I.G. for purposes of engaging in unlawful sexual activity.   The evidence the Government presented was insufficient to establish that Mr. Jimenez had knowledge or intent that Mr. Pulido and I.G. would engage in unlawful sexual activity in the United States before I.G. reached the age of consent.  Given the insufficiency of the Government's evidence, the district court erred as a matter of law in denying the motion for a judgment of acquittal.

The district court further erred in denying the motions for mistrial and for a new trial.  The unsolicited testimony from the case agent concerning Mr. Jimenez's immigration status deprived Mr. Jimenez of his right to a fair trial and consequently resulted in a miscarriage of justice.

Finally, the district court erred at sentencing in applying both the "care, custody, or supervisory control" and "undue influence" offense level enhancements. The district court erred as a matter of law in applying the "care, custody, or supervisory control" enhancement because the facts underlying that proposed enhancement arose from the alleged offense itself.  Similarly, the court clearly erred in applying the undue influence enhancement because no participant abused any superior knowledge, influence or resources in committing the alleged offense.

25

## ARGUMENTS AND CITATIONS OF AUTHORITY

## I.

## THE DISTRICT COURT ERRED IN DENYING THE MOTION FOR A JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT MR. JIMENEZ AGREED TO TRANSPORT I.G. FOR PURPOSES OF ENGAGING IN CRIMINAL SEXUAL ACTIVITY

The evidence presented against Appellant Roberto Jimenez was insufficient to support a finding that he knowingly and willfully entered in an agreement to transport I.G. for purposes of engaging in unlawful sexual activity.  While Mr. Jimenez knew I.G. was a minor and had entered into an agreement with his son Mr. Pulido that I.G. would travel to the United States with her family, the record was devoid of any evidence to suggest that any purpose of the agreement on the part of Mr. Jimenez was for I.G. to engage in sexual activity in the United States.  While Mr. Pulido may have had sexual contact with I.G. after she travelled to the United States, the evidence did not establish that Mr. Jimenez had knowledge or intent that any such sexual activity would occur in the United States before I.G. reached the lawful age of consent.  The evidence was thereby insufficient to permit a reasonable trier of fact to infer that Mr. Jimenez entered into an agreement with Mr. Pulido that I.G. would be transported for purposes of engaging in unlawful sexual activity.  The district court, consequently, erred in denying Mr. Jimenez's motion for a judgment of acquittal.

26

A. <u>The Elements and Proof Required for the Charge Alleged</u>

This Court has held that it will reverse a conviction if it finds that "a reasonable mind must entertain reasonable doubt about the guilt of the defendants." *United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir. 1988); *see also United States v. Simon*, 839 F.2d 1461, 1465 (11th Cir. 1988).   To prove the charge alleged in this case, the Government bore the burden of establishing "[1] that an agreement existed between two or more persons to commit a crime and [2] that [Mr. Jimenez] knowingly and voluntarily joined or participated in the conspiracy." *United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005) *citing United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983).   "The essence of the conspiracy is this agreement to commit an unlawful act."  *United States v. Chandler*, 388 F.3d 796, 805-06 (11th Cir. 2004) *citing United States v. Toler*, 144 F.3d 1423, 1425 (11th Cir. 1998).  This Court has advised "[w]hat distinguishes the offense of conspiracy from a substantive offense, is that 'agreement is the essential evil at which the crime of conspiracy is directed.'" *Id.* at 806 *quoting Iannelli v. United States*, 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).  "Thus the government must prove the existence of an *agreement* to achieve an unlawful objective and the defendant's *knowing* participation in that agreement." *Id.* (emphasis in original) *citing United States v. Adkinson*, 158 F.3d 1147, 1155 (11th Cir. 1998).

27

With respect to the substantive charges underlying the alleged conspiracy, the elements of transporting a minor with intent to engage in criminal sexual activity are:

(1) the Defendant knowingly transported the person named in the indictment in interstate or foreign commerce;

(2) at the time of the transportation, the person named in the indictment was less than 18 years old; and

(3) at the time of the transportation, Defendant intended that the person named in indictment would engage in prostitution or other unlawful sexual activity.

11th CIR. PATTERN JURY INSTRUCTIONS – CRIM. § 93.1 (2022).  Compounding on the principles of conspiracy, "conspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself." *United States v. Ross*, 131 F.3d 970, 980-81 (11th Cir. 1997) *quoting Ingram v. United States*, 360 U.S. 672 (1959) (emphasis in original). With respect to the instant case, while engaging in sexual activity need not have been the defendant's dominant purpose for the transportation of the minor, the Government bore the burden of proving that one of the defendant's motives was that the minor engage in illegal sexual activity.  *United States v. Hoschouer*, 224 Fed. Appx. 923, 925 (11th Cir. 2007).  Without such proof, the Government could not prove the requisite intent element. *Id.*

28

**B.** <u>The Evidence Failed to Prove the Existence of an Agreement Between Mr. Jimenez and Mr. Pulido that I.G. Would be Transported to Engage in Sexual Activity</u>

The evidence presented at trial was insufficient to establish that Mr. Jimenez entered into an agreement with his son to transport I.G. *for purposes of engaging in unlawful sexual activity*. Given the evidence, any finding that Mr. Jimenez had intent for I.G. to engage in sex in the United States before reaching the age of consent would have been the product of pure speculation. At the time arrangements began to be made for I.G. and her family to travel to Florida, Mr. Jimenez was well aware that I.G. and Mr. Pulido had developed a close relationship and intended to marry one another. While Mr. Jimenez had purportedly had discussions with Mr. Pulido and I.G. about sex, there was no indication that he had knowledge or intent that the two would have sexual relations in the United States while I.G. remained underage. Based on the evidence presented at trial, the "age of consent" in Croatia was apparently 15 years-old, or was believed to be so by Mr. Pulido and Mr. Jimenez. Mr. Pulido and I.G., likewise, were in Croatia with one another for six weeks while the discussions of sexual activity concerning Mr. Jimenez were taking place. Those discussions were, moreover, occurring when I.G. was 15 years-old. Therefore, while those discussions may have supported an inference that Mr. Jimenez had knowledge of sexual activity taking place between Mr. Pulido and I.G. *in Croatia*, they did not indicate that Mr. Jimenez had knowledge or intent for any such sexual activity to

occur while I.G. was *in the United States*.  Based on Mr. Jimenez's belief as to the law in Croatia, I.G. and Mr. Pulido would have been engaging in sexual activity lawfully while in Croatia.  The evidence gave no indication that Mr. Jimenez intended for them to continue to engage in sexual activity once they were in the United States, where it would have unlawful for them to continue a sexual relationship.

Even if one might infer that Mr. Jimenez intended for I.G. to remain in the United States permanently and to eventually marry Mr. Pulido, there was no evidence of an intent on the part of Mr. Jimenez that I.G. and Mr. Pulido have any sexual activity before I.G. reached the age to lawfully do so in the United States. I.G. certainly could have remained in the United States and carried out a platonic relationship with Mr. Pulido until she attained the age to have lawful sexual relations with him.  The evidence did not establish that Mr. Jimenez had intent that anything more occur sexually between I.G. and Mr. Pulido until such time.  Therefore, while the evidence supported findings that Mr. Jimenez entered into an agreement to that I.G. travel to the United States it did not support a finding that Mr. Jimenez intended for I.G.'s travel to be for the purpose of unlawful sexual activity.

Even when viewed in a light most favorable to the Government, the evidence was far from sufficient to prove an agreement or a meeting of the minds between Mr. Jimenez and Mr. Pulido that I.G. would engage in unlawful sexual activity when

she came to the United States. Though I.G. and Pulido may have engaged in sexual activity, there exists no evidence to establish, or even to permit an inference, that Mr. Jimenez had knowledge or intent that they would do so *in the United States before I.G. reached the age of consent*. Given the facts presented at trial, "without evidence showing or tending to show a meeting of the minds to commit an unlawful act, the conviction [against Mr. Jimenez] cannot stand." *United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988). The district court therefore erred as a matter of law in denying Mr. Jimenez's motion for a judgment of acquittal.

## II.

## THE DISTRICT COURT ERRED IN DENYING THE MOTIONS FOR MISTRIAL AND FOR A NEW TRIAL BASED ON THE CASE AGENT'S TESTIMONY CONCERNING MR. JIMENEZ'S IMMIGRATION STATUS

Federal Rule of Criminal Procedure 33(b)(2) affords district courts the authority to grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33. This Court has held that the standard for granting a new trial is broad and the decision to do so is within the sound discretion of the trial court. *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). A district may, and should, grant a new trial, if it finds that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Id.* A district court, furthermore, may grant a new trial even if the underlying error may not result in reversible error or even any legal error at all. *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). Nonetheless, this Court has directed that district courts should grant new trials in only "really exceptional cases." *United States v. Lopez*, 652 Fed. App'x 891, 898 (11th Cir. 2014).

A district court similarly has authority to declare a mistrial when "the ends of substantial justice cannot be attained without discontinuing the trial." *Goti v. United States*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961). This Court has directed that a district court may declare a mistrial when an event occurs that results in prejudice to a defendant's substantial rights. *United States v. Emmanuel*, 565 F.3d

32

1324, 1334 (11th Cir. 2009). As the district noted below, "[t]his occurs when there is a reasonable probability that, but for the [prejudicial] remarks, the outcome of the trial would have been different." *Id.* On the other hand, "prejudicial testimony will not mandate a mistrial when there is significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact on the verdict of the jury." *United States v. Anderson*, 782 F.2d 908, 816 (11th Cir. 1986). In addition, when a court gives a curative instruction in response to a prejudicial event, the standard for granting a mistrial is whether the error "is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Harriston*, 329 F.3d 779, 787, n.4 (11th Cir. 2003) *citing United States v. Funt*, 896 F.2d 1288, 1295 (11th Cir. 1990).

The prejudice that Mr. Jimenez suffered as a result of the case agent's unsolicited testimony concerning his immigration status resulted in a serious miscarriage of justice that could not be cured by the court's instruction to disregard the evidence. To illustrate, in *Sanchez v. Davis*, 888 F.3d 746, 752 (5th Cir. 2018), the Fifth Circuit addressed a situation analogous to that of the instant case and concluded that the mere mention of a defendant's immigration status can unduly prejudice a defendant to the point that the error cannot be remedied with a curative instruction. In that case, the Fifth Circuit addressed the denial of a certificate of appealability of a habeas claim asserting that the defendant's counsel rendered

33

ineffective assistance in failing to object to an irrelevant question concerning the defendant's immigration status. *Id.* at 749-50. In reviewing the issue, the Fifth Circuit noted that Texas courts have long recognized that a defendant's immigration status "is an 'inappropriate focal point for argument by the prosecution, particularly in light of the times.'" *Id.* at 750 *quoting Riascos v. State*, 792 S.W.2d 754, 756, 758 (Tex. App. - Houston 1990). It further recognized that immigration has become an even more sensitive concern in recent years: "In the quarter century since a state court of appeals made that observation, illegal immigration has only become a more 'highly charged'" issue. *Id.* at 751 *citing Republic Waste Servs., Ltd. v. Martinez*, 335 S.W.3d 401, 409 (Tex. App. - Houston 2011). The Fifth Circuit went on to reason that "the introduction of even a single impermissible mention of a defendant's immigration status is often a highly prejudicial bell that cannot be unrung." *Id.* at 752. The court thereby granted a COA on the ineffective assistance of counsel claim arising from the failure to object to a question concerning the defendant's immigration status. *Id.*

Consistent with the concerns addressed in *Sanchez*, the testimony concerning Mr. Jimenez's immigration status resulted in a miscarriage of justice that could not be cured with any instruction to the jury. In our current politically charged climate, a defendant's potentially illegal immigration status is a fact that many jurors cannot set aside. To make matters worse, Mr. Jimenez had no way of ensuring that any

34

jurors sitting on his case would not be unduly influenced by evidence of his purported illegal status. Because Mr. Jimenez never expected any such evidence to come out in light of his motion in limine, he had no reason to question potential jurors with regard to that topic so as to determine which potential jurors might not be able to set aside such information. While the testimony at issue from the case agent was admittedly brief, it clearly relayed to the jury that Mr. Jimenez does not have legal status in the United States. To be sure, as in *Sanchez*, it only took a mere mention of Mr. Jimenez's immigration status to relay to the jury that Mr. Jimenez may be in the United States illegally. Not only is such testimony inadmissible evidence of another alleged crime or bad act, but it is also of such a nature that it deprives a defendant of any chance at a fair trial in our current times. As the Fifth Circuit seemingly recognized in *Sanchez*, many members of our current society are strongly opposed to immigration, legal or otherwise. Under the circumstances, one cannot expect a reasonable jury to disregard evidence of a defendant's allegedly illegal immigration status.

Given the significance of the testimony concerning Mr. Jimenez's immigration status, the case agent's testimony supported both the grant of the mistrial and the motion for a new trial. The agent's testimony resulted in a miscarriage of justice, particularly given that Mr. Jimenez's immigration was the subject of a motion in limine. Given the current politically charged climate, the

reference to Mr. Jimenez's immigration status certainly deprived him of a fair trial and thereby prejudiced his substantial rights. The interests of justice therefore supported the declaration of a mistrial and the grant of a new trial pursuant to Rule 33. Should this Court decline to remand this case with instructions to enter a judgment of acquittal, Mr. Jimenez respectfully requests the Court, for the reasons set forth above, to reverse his conviction and remand this case with instructions to conduct a new trial.

## III.

## THE DISTRICT COURT ERRED IN IMPOSING THE U.S.S.G. § 2G1.3(b)(1)(B) OFFENSE LEVEL ENHANCEMENT FOR THE DEFENDANT HAVING CUSTODY, CARE OR SUPERVISORY CONTROL OVER THE MINOR

The district court further erred as a matter of law in assessing the two-level offense level enhancement under U.S.S.G. § 2G1.3(b)(1)(B) for the minor victim having been in the custody, care, or supervisory control of the defendant. As discussed in greater detail below, any care, custody, or control that Mr. Jimenez purportedly had over I.G. did not transpire until after and as a result of I.G.'s travel to the United States. Mr. Jimenez did not, therefore, have the parent-like level of custody over I.G. that could have supported the application of the "custody, care, or supervisory control" enhancement. On the contrary, whatever care, custody, or control that Mr. Jimenez had over I.G. arose entirely from the offense he was convicted of – transporting a minor. Given the facts of the case, the district court erred in overruling Mr. Jimenez's objection to that offense level enhancement.

The applicable Guidelines provision, U.S.S.G. § 2G1.3, provides for a two-level offense level increase "[i]f (A) the defendant was a parent, relative, or legal guardian of the minor; or (B) the minor was otherwise in the custody, care, or supervisory control of the defendant, increase by 2 levels." U.S.S.G. § 2G1.3(b)(1). The commentary to Section 2G1.3 additionally provides that the "Custody, Care, or Supervisory Control" enhancement "is intended to have broad application and

includes offenses involving a victim less than 18 years of age entrusted to the defendant, whether temporarily or permanently." U.S.S.G. § 2G1.3, cmt., n. 2(A). The commentary goes on to provide examples of classes of persons to whom the enhancement is intended to apply as "teachers, day care providers, baby-sitters, or other temporary caretakers." *Id.* The commentary then advises that courts "should look to the actual relationship that existed between the defendant and the minor and not simply to the legal status of the defendant-minor relationship." *Id.*

In *United States v. Brooks*, 610 F.3d 1186 (9th Cir. 2010), the Ninth Circuit addressed the "custody, care, or supervisory control" enhancement in a case in which the defendant took in two teenage runaways at a hotel and went on to introduce and encourage them into prostitution. *Id* at 1191-92. After being convicted of charges arising from that conduct, the defendant was assessed the two-level "custody, care, or supervisory control" enhancement at sentencing. *Id.* at 1200. In reviewing the applicability of that enhancement on appeal, the Ninth Circuit noted that "[i]t is true that, in a technical sense, Brooks exercised a form of "care," "custody," or "supervisory control" over [the victims] through his participation in the offenses." *Id.* It went on to reason, however, that the level of care, custody or control exercised by a defendant subject to the Section 2G1.3(b)(1)(B) enhancement must be the same "parent-like" level of care, custody, or supervisory control as is proscribed in 2G1.3(b)(1)(A). *Id.* The court consequently reasoned that "[i]n cases like Brooks's,

where the relationship between the defendant and the minor arose almost entirely from the crime itself, application of this enhancement is warranted neither by the language of the guideline and its Commentary nor by common sense." *Id.* at 1201. The court then held that "for the enhancement to apply, the defendant must have held a position of parent-like authority that existed apart from conduct giving rise to the crime." *Id.*

As in *Brooks*, the level of care, custody, or supervisory control that Mr. Jimenez exercised over I.G. was not the level of the "parent-like" control that would support the Section 2G1.3(b)(1)(B) enhancement. More critically, any care, custody, or control that Mr. Jimenez had over I.G. arose entirely from the offense at issue. Indeed, it was the very same acts of transporting I.G. that put Mr. Jimenez in a purported position of care, custody, or control. But for the alleged act of transporting I.G., Mr. Jimenez would never have been in position of care, custody, or control over I.G. in any way whatsoever. Moreover, whatever care, custody, or control Mr. Jimenez had over I.G. resulted *after*, and as a result of, the alleged offense. Mr. Jimenez could not, therefore, have had the requisite care, custody, or supervisory control over I.G. to support the application of the Guidelines enhancement.

Given the foregoing, the Government simply could not establish that the facts of the instant case triggered the application of the Section 2G1.3(b)(1)(B)

enhancement. The district court, therefore, erred in overruling Mr. Jimenez's objection to that proposed offense level enhancement.

## IV.

### THE DISTRICT COURT FURTHER ERRED IN IMPOSING THE "UNDUE INFLUENCE" OFFENSE LEVEL ENHANCEMENT

The district court further erred as a matter of law in imposing the two-level offense level enhancement for unduly influencing a minor to engage in prohibited sexual conduct.  Mr. Jimenez neither utilized nor abused any superior knowledge, influence or resources in committing the alleged offense.  Therefore, despite the fact that he was more than ten years older than I.G., he exercised no undue influence over I.G.  Consequently, the facts of the case did not support the application of the undue influence enhancement.

Section 2G1.3 allows for a two-level offense level enhancement "[i]f (A) the offense involved the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in prohibited sexual conduct; or (B) a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct." U.S.S.G. § 2G1.3(b)(2).  The commentary advises "in determining whether subsection (b)(2)(B) applies, the court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior.  The

voluntariness of the minor's behavior may be compromised without prohibited sexual conduct occurring." U.S.S.G. § 2G1.3 cmt., n.3(B). The commentary additionally sets out a rebuttable presumption that the undue influence enhancement applies if a participant is ten years or more older than the minor. *Id.* As the basis for the rebuttable presumption, the commentary states "[i]n such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor." *Id.*

This Court has held that, when a defendant seeks to rebut the undue influence presumption, the district court should consider whether the defendant's "conduct displayed an abuse of superior knowledge, influence and resources." *United States v. Whyte*, 928 F.3d 1317, 1336 (11th Cir. 2019) *quoting United States v. Blake*, 868 F.3d 960, 977 (11th Cir. 2017). With respect to cases involving allegations of minors engaging in prostitution, the Court has provided that "[a] defendant abuses his superior knowledge and resources by managing his victim's prostitution through actions like advertising her services, driving her to engagements, and handling the money." *Id.* In the seminal case addressing the enhancement, *United States v. Whyte*, the Court found that the defendants abused superior knowledge and resources by managing internet prostitution advertisements for a victim, communicating with johns on a specially designated phone, using resources to facilitate prostitution engagements, obtaining a false identity for a victim so she could work at strip clubs,

41

driving a victim to engagements, collecting money from engagements, and exerting influence and persuasion over a victim's emotions. *Id.*

In contrast to *Whyte*, the facts of the instant case did not support the application of the undue influence enhancement. While Mr. Jimenez was more than ten-years older than I.G., he sufficiently rebutted the presumption with reliance on the evidence presented at trial. Mr. Jimenez established that he never did anything to abuse any purportedly superior knowledge, influence or resources. The evidence established that I.G. determined on her own to engage in sexual activity and to travel to the United States. She made those decisions as a result of her feelings for Mr. Pulido. Despite the criminality of any sexual contact between I.G. and Mr. Pulido in the United States, the evidence indicated that their love for one another was genuine. Those feelings and emotions arose without any influence from Mr. Jimenez. The facts likewise indicate that I.G. and Mr. Pulido developed those feelings before Mr. Jimenez ever had any purported contact with I.G. While Mr. Jimenez may have encouraged the relationship and may have provided funds for I.G. and her family to travel, those actions certainly did not constitute an abuse of superior knowledge, influence or resources.

Just the same, whatever actions Mr. Jimenez may have undertaken after I.G. entered the United States were not abuses of superior knowledge, influence or resources. Any alleged actions taken to manipulate I.G.'s family by either Mr.

42

Pulido or Mr. Jimenez did not rise above the level of typical deception. Likewise, the alleged control over I.G.'s communications and the assistance in initiating immigration proceedings did not result from any superior knowledge, influence or resources. With respect to the communications, I.G. continued to have communications with her family and, indeed, initiated the law enforcement contact through her mother. With respect to the immigration paperwork, the evidence did not indicate that Mr. Jimenez used any superior knowledge, influence or resources. On the contrary, it appeared that Mr. Jimenez had only rudimentary knowledge of immigration and had done little more than consult with an immigration attorney. In the end, whatever influence Mr. Jimenez exercised was part and parcel of the offense for which he was charged. He did nothing to exert undue influence nor to abuse any superior knowledge, influence or resources. Under the circumstances, Mr. Jimenez sufficiently rebutted the presumption that the "undue influence" enhancement was applicable to the facts of this case.

The conduct of Mr. Pulido was similarly insufficient to trigger the application of the undue influence enhancement. Mr. Jimenez recognizes that the text of the U.S.S.G. § 2G1.3(b)(2)(B) calls for the enhancement to apply as to the conduct of any participant in the offense, not merely the defendant at issue. The only other participant in the alleged offense was Mr. Pulido. Whatever influence Mr. Pulido exercised over I.G. was emotional. As set forth above, the evidence indicated that

the feelings between I.G. and Mr. Pulido were genuine. While sexual contact between I.G. and Mr. Pulido was criminal in the United States, the evidence did not suggest that Mr. Pulido did anything to unduly influence I.G. to travel to the United States or to allegedly engage in sexual contact with him. The undue influence enhancement could not, therefore, vicariously apply to Mr. Jimenez by virtue of any of Mr. Pulido's actions.

Given the facts of the case, neither Mr. Jimenez nor Mr. Pulido abused any superior knowledge, influence or resources so as to unduly influence I.G. The district court thereby clearly erred in applying that enhancement to Mr. Jimenez's Guidelines calculation.

## <u>CONCLUSION</u>

Based on the foregoing, Appellant Jimenez respectfully requests that this Honorable Court reverse the judgment and sentence and remand this case to the district court with instructions to enter a judgment of acquittal. In the alternative, Mr. Jimenez would ask this Court to remand this case with instructions to conduct a new trial or, as a second alternative, to conduct a new sentencing hearing.

Respectfully submitted,

s/ *Frank W. McDermott*
Frank W. McDermott
Board Certified Attorney
Florida Bar No. 163120
McDermott Law Firm, P.A.
10010 Seminole Blvd.
Seminole, FL 33772
Phone: 727-367-1080
Fax: 727-367-9940
Frank@injuryarrest.com
CJA Counsel for Appellant Jimenez

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned certifies that, pursuant to 11th Cir. R. 28-1, this Brief complies with the type-volume limitation of and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,351 words, excluding the parts exempted by Rule 32(a)(7)(B)(iii). Microsoft Word software was used to count the words in the foregoing Brief. This Brief, likewise, complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

s/ *Frank W. McDermott*
Frank W. McDermott
Board Certified Attorney
Florida Bar No. 163120
McDermott Law Firm, P.A.
10010 Seminole Blvd.
Seminole, FL 33772
Phone: 727-367-1080
Fax: 727-367-9940
Frank@injuryarrest.com
CJA Counsel for Appellant Jimenez

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, on this 21st day of December 2022.

s/ <i>Frank W. McDermott</i>
Frank W. McDermott
Board Certified Attorney
Florida Bar No. 163120
McDermott Law Firm, P.A.
10010 Seminole Blvd.
Seminole, FL 33772
Phone: 727-367-1080
Fax: 727-367-9940
Frank@injuryarrest.com
CJA Counsel for Appellant Jimenez

I FURTHER CERTIFY that seven hard copies of the foregoing brief will be furnished to the Clerk of this Court by mail.

s/ <i>Frank W. McDermott</i>
Frank W. McDermott
Board Certified Attorney
Florida Bar No. 163120
McDermott Law Firm, P.A.
10010 Seminole Blvd.
Seminole, FL 33772
Phone: 727-367-1080
Fax: 727-367-9940
Frank@injuryarrest.com
CJA Counsel for Appellant Jimenez
